UNITED STATES DISTRICT COURT  FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

| LEWIS BRASS AND COPPER COMPANY, | AMENDED MEMORANDUM |
| Plaintiff, | AND ORDER |
| - versus - | 13-CV-3251 |
| ABF FREIGHT SYSTEM, INC. | |
| Defendant. | |

APPEARANCES:

    WEXLER BURKHART HIRSCHBERG & UNGER, LLP
        377 Oak Street, Concourse Level – C2
        Garden City, New York 11530
    By:    Ian J. Frimet
        *Attorneys for Plaintiff*

    BARRY N. GUTTERMAN & ASSOCIATES
        85 Davids Way
        Bedford Hills, New York 10507
    By:    Barry N. Gutterman
        *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

        Lewis Brass and Copper Company ("LBC") brings this action against ABF Freight System, Inc. ("ABF") for the loss of two shipments of copper shipped by LBC using ABF's freight services. LBC asserts claims under state law as well as the Carmack Amendment, 49 U.S.C. § 14706. ABF has moved for summary judgment. I conclude that LBC's state law claims are preempted, and that LBC's Carmack Amendment fails because the losses were attributable solely to its own actions. I also conclude that, because ABF complied with the terms of its contract but has not yet been paid, it is entitled to judgment on its counterclaim for breach of contract. Thus, I grant ABF's motion for summary judgment.

BACKGROUND

A.    *Factual Background*

The following facts are taken from the parties' Local Rule 56.1 statements and affidavits. Unless otherwise noted, the facts set forth below are uncontroverted.

According to the statement of Martin Erdfarb, LBC's CFO, LBC was contacted by two people – claiming to be Scott Ellis and Derick Lamberti – in May of 2012. They purported to represent a roofing company, S&C Roofing Gutters ("S&C"), in Illinois. On May 17, S&C contracted with LBC for $22,720.54 of copper, paid by credit card. Erdfarb Aff. ¶¶ 2-3, ECF No. 25.

On May 29, 2012, LBC contracted with ABF to ship that order – in the form of two skids of copper – from Glendale, New York to an address in Chicago, Illinois. LBC prepared a bill of lading for the shipment, which listed the Chicago address as the destination, S&C as the consignee, and the instruction to "Call before delivery Scott (773) 683-7474." Crouse Aff., Ex. A, ECF No. 23-1. The shipment arrived without incident at ABF's shipping dock in Sauk Village, Illinois on May 31, 2012. It is disputed whether ABF called Scott or whether Scott called ABF, but a phone conversation did occur, and Scott told ABF that S&C would pick the delivery up from ABF's dock. An apparent S&C designee, Kenneth, picked up the shipment on May 31; he signed his name and entered his driver's license number, though his last name was illegible. Def.'s Rule 56.1 Statement, ¶¶ 4-13, ECF No. 21; Pl.'s Rule 56.1 Statement, ¶¶ 4-13, ECF No. 26.

On June 1, LBC contracted with S&C for a second order of copper worth $20,822.82. Payment was split between two credit cards. LBC again contracted with ABF to ship the order to the same Chicago address and included the same instruction to call Scott.

Erdfarb Aff. ¶¶ 7-9; Crouse Aff., Ex. C, ECF No. 23-1. The shipment contract was entered into on June 7, and the shipment was delivered to ABF's Chicago shipping dock on June 11. Again there is a dispute about whether ABF called Scott or vice versa, but once again the cargo was picked up by an apparent S&C designee, this time a John Greene, who signed his name and printed his driver's license number on a delivery receipt. Def.'s Rule 56.1 Statement, ¶¶ 8-12, 14-15.

Shortly after the shipments were picked up, the banks processing the credit card payments for the orders informed LBC that the charges were being disputed because the card holders claimed that their cards had been stolen. After fighting the disputed charges, LBC ultimately was not paid for the shipments. Erdfarb Aff. ¶¶ 11-12. Upon investigation, LBC also learned that the license numbers provided when the loads of cargo were picked up were fake, and that the phone number provided for Scott was also fake. *Id*. ¶¶ 16, 19. Furthermore, the address that S&C had originally provided to LBC is, according to LBC's Amended Complaint (in turn based on an image from Google Maps), "an empty lot in a dilapidated part of Chicago." Am. Compl. ¶ 37 & Ex. J, ECF No. 16.

LBC commenced this action in state court, and it was removed by ABF on June 6, 2013. After LBC amended its complaint to assert a claim under the Carmack Amendment, ABF moved for summary judgment. I heard argument on the motion on February 28, 2014.[1]

DISCUSSION

A. *Summary Judgment Standard*

A court may grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[1] The day before argument, counsel for LBC sought leave to file a surreply in opposition to ABF's motion for summary judgment. The request is denied. LBC had an opportunity to make all of its arguments in opposition.

3

law." Fed. R. Civ. P. 56(a). A fact is "material" if its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

B.  *Removal and State Law Claims*

Although neither party addresses the matter, I note briefly (in order to satisfy myself that subject matter jurisdiction lies in this court) that removal of the case from state court was proper. For essentially the same reasons, I also agree with ABF that plaintiff's state law claims must be dismissed as preempted.

"Any action that was originally filed in state court may be removed by a defendant to federal court only if the case originally could have been filed in federal court." *Marcus v. AT&T Corp.*, 138 F.3d 46, 52 (2d Cir. 1998) (citing 28 U.S.C. § 1441(a)). Where, as here, the requirements of diversity jurisdiction are not satisfied (here, the amount in controversy does not reach the statutory minimum, *see* 28 U.S.C. § 1332(a)), removal is permissible only if the case satisfies federal question jurisdiction. *Marcus*, 138 F.3d at 52. "The presence or absence of federal question jurisdiction is governed by the well-pleaded complaint rule. That rule provides that federal question jurisdiction exists only when the plaintiff's own cause of action is based on federal law, and only when plaintiff's well-pleaded complaint raises issues of federal law." *Id.* (internal citations omitted). In the vast majority of cases, that analysis is

law." Fed. R. Civ. P. 56(a). A fact is "material" if its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

B.  *Removal and State Law Claims*

Although neither party addresses the matter, I note briefly (in order to satisfy myself that subject matter jurisdiction lies in this court) that removal of the case from state court was proper. For essentially the same reasons, I also agree with ABF that plaintiff's state law claims must be dismissed as preempted.

"Any action that was originally filed in state court may be removed by a defendant to federal court only if the case originally could have been filed in federal court." *Marcus v. AT&T Corp.*, 138 F.3d 46, 52 (2d Cir. 1998) (citing 28 U.S.C. § 1441(a)). Where, as here, the requirements of diversity jurisdiction are not satisfied (here, the amount in controversy does not reach the statutory minimum, *see* 28 U.S.C. § 1332(a)), removal is permissible only if the case satisfies federal question jurisdiction. *Marcus*, 138 F.3d at 52. "The presence or absence of federal question jurisdiction is governed by the well-pleaded complaint rule. That rule provides that federal question jurisdiction exists only when the plaintiff's own cause of action is based on federal law, and only when plaintiff's well-pleaded complaint raises issues of federal law." *Id.* (internal citations omitted). In the vast majority of cases, that analysis is

simple: removal on federal question grounds is permitted when the plaintiff has brought a federal cause of action.

This case does not fall into that simple category. The plaintiff did not bring any federal causes of action; the only claims in the original state complaint are for breach of contract and negligence. *See* Complaint, ECF No. 1, Ex. A, at ¶¶ 19-31. Nonetheless, removal was proper here under the doctrine of complete preemption. In some areas of law, Congress has manifested an intent to wholly occupy the field, and state causes of action are replaced by federal law. *See, e.g., Lehmann v. Brown*, 230 F.3d 916, 919 (7th Cir. 2000) ("State law is 'completely preempted' in the sense that it has been replaced by federal law . . . ."). A plaintiff aggrieved in such an area of the law may *only* bring a federal cause of action – a putative state law claim must be read as a federal one – and therefore, such a claim is necessarily removable. *See Marcus*, 138 F.3d at 53.

The Carmack Amendment is such an area of law. Although the Second Circuit has not expressly ruled on the matter, other federal courts have relied on the Supreme Court's decision in *Adams Express Co. v. Croninger*, 226 U.S. 491, 505-07 (1913), to hold that when Congress enacted the Carmack Amendment to the Interstate Commerce Act in 1906, it intended to create a comprehensive – and exclusive – federal scheme to govern the field of interstate shipping liability. *See, e.g., Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115, 1120-23 (9th Cir. 2011); *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 772-78 (5th Cir. 2003). As the Supreme Court explained, Congress stepped in to remedy the perceived problem of having many states' disparate laws potentially apply to interstate shipping, and its regulatory scheme was so complete that the law must be read to "supersede all state regulation" of interstate shipping liability:

> [T]his branch of interstate commerce was being subjected to such a
> diversity of legislative and judicial holding that it was practically

> impossible for a shipper engaged in a business that extended beyond the confines of his own state, or a carrier whose lines were extensive, to know, without considerable investigation and trouble, and even then oftentimes with but little certainty, what would be the carrier's actually responsibility as to goods delivered . . . from one state to another. . . .
>
> That the legislation supersedes all the regulations and policies of a particular state upon the same subject results from its general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue, and limits his power to exempt himself by rule, regulation, or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it.

*Adams Express*, 226 U.S. at 151-52 (internal quotation marks and citations omitted).

"Since *Adams Express*, courts have been nearly uniform in holding that the Carmack Amendment preempts state law remedies for loss or damage to goods shipped by common carriers." *Roberts v. N. Am. Van Lines*, 394 F. Supp. 2d 1174, 1179 (N.D. Cal. 2004). Because the claims here are for "loss or damage to goods shipped by [a] common carrier[]," the state law claims in the original complaint – for negligence and breach of contract – are preempted.

Two conclusions result. First, removal was proper. Second, plaintiff's state law claims (the second and third causes of action in the Amended Complaint) are preempted; therefore, I grant summary judgment to defendant on those claims.

C.    *Carmack Amendment Claims*

The principal dispute is whether plaintiff's Carmack Amendment claims survive summary judgment.

The Carmack Amendment "imposes something akin to strict liability" on carriers of goods. *Mitsui Sumitomo Ins. Co., Ltd. v. Evergreen Marine Corp.,* 621 F.3d 215, 216 (2d Cir.

2010) (per curiam). The plaintiff must first show a prima facie case by demonstrating "(1) delivery to the carrier in good condition; (2) arrival in damaged condition; and (3) the amount of damages caused by the loss." *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 73 n.6 (2d Cir. 2001). The burden then shifts to the defendant to show one of several affirmative defenses. *Id*. "[T]he statute codifies the common-law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was caused by (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." *Missouri Pac. R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964) (internal quotation marks omitted).

Defendant ABF does not contest, for the purposes of this motion, that LBC can establish a prima facie case. Rather, ABF argues – though not with total clarity – that the loss should be excused because it was due to the act of the shipper himself.[2] *See* Def.'s Reply at 6, ECF No. 27.

Reported decisions on the "act of the shipper himself" defense focus on a shipper's failure to properly package or otherwise prepare goods for transit. A leading treatise summarizes them as follows: "The defense encompasses such acts as a misdescription of the contents of the packages or containers by the shipper on the bill of lading, or defective loading or counting of the shipment where the shipment is specifically stated to be a shipper's load and count shipment." 1 Saul Sorkin, Goods in Transit § 5.10 (2013).

The defense is animated by the same idea underlying the general rule. The risk of harm to the goods is placed on the carrier while the goods are under its control, since the carrier is the cheapest cost avoider for accidents and damage occurring during this time. But other risks

---

[2] In the context of interstate shipping law, the "carrier" is the party that does the transporting (here, ABF), while the "shipper" is the party whose goods are shipped (here, LBC).

7

– such as the risks that goods are improperly labeled or packaged – are more easily avoided by the shipper. The principle extends to risks that the shipper would know, but the carrier would not: For example, one court held that a carrier would not be liable under the Carmack Amendment for freezing damage to a shipment of wine, since the shipper had not notified the carrier of any special handling requirements for the wine. *Pilgrim Distrib. Corp. v. Terminal Transp. Co., Inc.*, 383 F. Supp. 204, 209-10 (S.D. Ohio 1974).

The facts of this case are somewhat different, but I conclude that the same principle should apply. The Carmack Amendment governs harms that occur during the shipping process, because those are the only harms for which it makes sense to shift the burden of risk to the carrier.[3] The statute cannot properly be read to make a carrier liable for fraud that is collateral to the shipping process.

Before concluding that ABF's summary judgment motion should be granted, though, I must explain why I am confident that the fraud here is "collateral to the shipping process." After all, LBC contends that ABF was directly implicated in the fraud's success. According to LBC, ABF did not call Scott's number, and it is agreed that ABF did not deliver the shipments to the address specified. If ABF had done either of these things, LBC argues, the fraud would have been defeated: the phone number for "Scott" was fake, and the address was an abandoned lot. Had ABF discovered either fact and reported them to LBC, the order could have been canceled.

But these hypothetical possibilities, though plausible, do not make ABF responsible for the loss of the shipments. First, as to the phone call, there is a dispute about

---

[3] For example, as the Second Circuit has noted with respect to the Carriage of Goods by Sea Act, a similar provision governing liability of common carriers, "the whole point of the prima facie requirements," the gateway to a COGSA claim, "is to establish that the damage to the goods occurred while under the supervision of the defendant." *Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration*, 137 F.3d 94, 99 (2d Cir. 1998).

whether ABF called Scott or he called ABF, but there is no dispute that a phone conversation occurred. Except under extraordinary circumstances, I cannot see how an instruction to "call Scott" is not satisfied by simply having a phone conversation with him, whoever initiates the call.

Second, as to delivery, ABF had no information that Scott (as representative of S&C) or his designee was not the proper recipient. Each bill of lading indicated "S&C" as the consignee. Under relevant sections of the Federal Bill of Lading Act, ABF was permitted to deliver the goods to "the consignee named in a nonnegotiable bill." 49 U.S.C. § 80110(b)(2). "A 'straight bill of lading,'" including both of the two bills involved here, "simply requires delivery of the goods to the consignee." *Id.*; *see also Electro Source v. UPS*, 95 F.3d 837, 838 n.3 (9th Cir. 1996) ("A straight bill of lading is one in which the goods are consigned to a specific person."). Similarly, ABF did not violate 49 U.S.C. § 80111(a)(1), governing liability on bills of lading, since it neither "deliver[ed] the goods to a person not entitled to their possession" (S&C was, under the terms of the bill, entitled to possession), and it did not run afoul of § 80111(a)(3), since it did not "ha[ve] information it is delivering the goods to a person not entitled to their possession."

Federal decisions support my view. As a general matter, "[c]ommon carrier liability ceases upon delivery of the shipment to the consignee." *Republic Carloading & Distrib. Co. v. Missouri Pac. R. Co.*, 302 F.2d 381, 386 (8th Cir. 1962). "Since 'delivery' must mean delivery as required by the contract [of carriage], (i.e., the bill of lading and the tariffs), the intention of the parties defines its scope." *Intech, Inc. v. Consolidated Freightways, Inc.*, 836 F.2d 672, 674 (1st Cir. 1987) (citing *Georgia, F. & A. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 195 (1916)). Here, the bills of lading – prominently labeled as straight bills – listed S&C as the

9

consignee and contained directives to call the consignee before delivery. In each case, the consignee instructed ABF to keep the goods at its dock until a designee could pick them up. Had the instruction to call Scott been absent, LBC would have a stronger argument that the failure to deliver to the address named in the bills of lading constituted a failure to deliver the goods. But given the instruction, I understand that LBC and ABF contemplated that the consignee might give more specific instructions for delivery. Thus, ABF's actions accord with the contractual intent in the bills of lading, since ABF apparently delivered the goods to S&C pursuant to the instructions.

Told in the most obvious way, this is not a story of negligence on either LBC's or ABF's part; rather, it is the story of LBC's victimization by unknown fraudsters. Nonetheless, in the context of this bilateral suit, one the parties now before me has to bear the risk of the fraudulent orders. That party is LBC. ABF's motion for summary judgment on LBC's claims is granted. For essentially the same reasons, I find that ABF is entitled to payment for its services, since it complied with the terms of its contract. Therefore I grant summary judgment to ABF on its counterclaim for contractual damages in the amount of $1574.73.

## CONCLUSION

For the reasons stated above, ABF's motion for summary judgment is granted.

So ordered.


John Gleeson, U.S.D.J.


Dated: March 13, 2014
      Brooklyn, New York